# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

────────────

SHELBY ROBERTS,

*Plaintiff - Appellant,*

v.

CARTER-YOUNG, INC.,

*Defendant - Appellee.*

────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO

────────────

## OPENING BRIEF OF APPELLANT

────────────

Charles P. Roberts, III
ATTORNEY AT LAW
7001 Mustang Court
Summerfield, NC 27358
336-392-3155
cprobertsiii@protonmail.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>23-1911</u>          Caption: <u>Shelby Roberts v. Carter-Young, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Shelby Roberts</u>
(name of party/amicus)

_____

who is _____<u>Appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Charles P. Roberts III         Date:      9/07/2023

Counsel for: Appellant

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................iv

STATEMENT OF JURISDICTION..........................................................................1

STATEMENT OF ISSUES ......................................................................................2

STATEMENT OF CASE ..........................................................................................3

    A.    Material Facts .................................................................................3

    B.    Roberts' Legal Claims ....................................................................9

    C.    The District Court's Decision.......................................................10

SUMMARY OF ARGUMENT ...............................................................................13

ARGUMENT ..........................................................................................................19

    STANDARD OF REVIEW ..............................................................................19

    DISCUSSION OF ISSUES ..............................................................................20

    A. Roberts Plausibly Alleges That Carter-Young Violated Its Obligations Under FCRA §1681s-2(b)(1)................................................20

        1. FCRA Is A Consumer Protection Statute That Is Interpreted Liberally .......................................................................20

        2. Congress Amended FCRA In 1996 And Again In 2003 To Impose Obligations On Furnishers Of Information ...........................21

        3. A Furnisher Is Obligated To Conduct A Reasonable Investigation Of A Consumer's Indirect Dispute And If It Determines That The Disputed Information Is Inaccurate, Misleading, Or Incapable Of Being Verified, It Shall Modify Or Delete Its Reporting Of That Information ......................................23

i

4. Roberts Clearly Alleged All Essential Elements Of A §1681s-2(b)(1) Claim ........................................................................... 25

5. The District Court Misconstrued The Scope Of A Furnisher's Obligations Under §1681s-2(b)(1) ..................................... 29

B. This Court Should Decline To Recognize A "Legal Dispute" Exception To A Furnisher's Obligations Under §1681s-2(b)(1) ................. 33

1. The Statute Does Not Distinguish Between "Legal" And "Factual" Disputes And Includes No Exceptions ............................... 34

2. The "Legal Dispute" Exception, As Applied To Furnishers, Finds Little Support Among The Circuit Courts Of Appeals ............ 36

3. The Legal Dispute Exception Is Inconsistent With The Text And Purpose Of §1681s-2(b)(1)(E) .................................... 42

4. This Court Should Decline To Recognize A Categorical Exception For Legal Disputes ........................................... 44

C. If The Exception Is Applicable To Furnishers, It Must Be Narrowly Cabined And Limited To True Legal "Defenses" To A Debt ...................... 44

D. Roberts Disputed Both The Factual Existence And Amount Of The Debt. The Complaint Raises No "Legal" Defense To The Debt .................. 45

1. Roberts' Dispute Did Not Raise Any Underlying Legal Questions That Only A Court Could Resolve. A Legal Dispute Does Not Exist Merely Because A Furnisher May Need To Consult A Legal Document Or Be Cognizant Of Undisputed Legal Principles ................................................................. 45

2. Roberts' State Court Lawsuit Against Ansley Did Not Create a Legal Issue ........................................................... 49

3. Roberts' Allegations That the Debt Was Fraudulent and Retaliatory Were Factual Assertions and Did Not Create a Legal Dispute ........................................................... 51

4. Roberts Repeatedly Disputed the Factual Existence And Amount Of The $791.14 Debt. The District Court Improperly Recharacterized Plaintiff's Factual Allegations And Drew Inferences Adverse to Plaintiff ............................................................ 52

CONCLUSION ........................................................................................ 54

ORAL ARGUMENT STATEMENT ...................................................... 55

CERTIFICATE OF COMPLIANCE ...................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 19

*Bates v. United States*,
522 U.S. 23 (1997) .......................................................................... 35

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 19

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC,*
80 F.4th 466 (4th Cir. 2023) ........................................................... 19

*Carvalho v. Equifax Information Services, LLC*,
629 F.3d 876 (9th Cir. 2010) ........................................................... 38

*Chiang v. Verizon New England, Inc.*,
595 F.3d 26 (1st Cir. 2010) .............................................................. 41

*Curtis v. Propel Prop. Tax Funding, LLC*,
915 F.3d 234 (4th Cir. 2019) ..................................................... 13, 21

*Dalton v. Capital Associated Indus.*,
257 F.3d 409 (4th Cir. 2001) ........................................................... 20

*Daugherty v. Ocwen Loan Servicing, LLC*,
701 F. App'x 246 (4th Cir. 2017) ............................................... 24, 30

*Deandrade v. Trans Union LLC*,
523 F.3d 61 (1st Cir. 2008) .............................................................. 41

*Denan v. Trans Union LLC*,
959 F.3d 290 (7th Cir. 2020) ...................................................... 17, 38

*Gross v. CitiMortgage, Inc.*,
33 F.4th 1246 (9th Cir. 2022) ............................................. 17, 37, 47

*Guthrie v. PHH Mortgage Corp.*,
79 F.4th 328 (4th Cir. 2023) .................................................... *passim*

*Hinkle v. Midland Credit Mgmt., Inc.*,
827 F.3d 1295 (11th Cir. 2016) ............................................... *passim*

*Hoke v. Retail Credit Corp.*,
  521 F.2d 1079 (4th Cir. 1975) ............................................................ 21

*Hrebal v. Seterus, Inc.*,
  598 B.R. 252 (D. Minn. 2019) ............................................................ 42

*Ingram v. Experian Info. Sols., Inc.*,
  83 F.4th 231 (3d Cir. 2023) .................................................. 20, 21, 35-36

*Johnson v. MBNA American Bank, NA*,
  357 F.3d 426 (4th Cir. 2004) ........................................................ *passim*

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) ............................................................................ 34

*Pinner v. Schmidt*,
  805 F.2d 1258 (5th Cir. 1986) ............................................ 20, 27, 31, 51

*Saunders v. BB&T Co of Virginia*,
  526 F.3d 142 (4th Cir. 2008) ................................... 11, 17, 24, 27, 39

*Sessa v. Trans Union, LLC*,
  74 F.4th 38 (2d Cir. 2023) ............................... 17, 29, 35, 45, 47, 48

*United States v. Rutherford*,
  442 U.S. 544 (1979) .......................................................................... 35

*Wright v. Experian Information Solutions, Inc.*,
  805 F.3d 1232 (10th Cir. 2015) .................................................. 17, 38

## Statutes

15 U.S.C. § 1681 ....................................................................*passim*
28 U.S.C. § 1291 ............................................................................ 2
28 U.S.C. § 1331 ............................................................................ 1
N.C. Gen. Stat. § 7A-210 .............................................................. 50
N.C. Gen. Stat. § 75-50 ............................................................ 7, 49

## Rules

Fed. R. Civ. P. 12 .................................................................... 1, 19

v

## Other Authorities

12 C.F.R. § 1022.41 ............................................................... 38

*Black's Law Dictionary*
   (10th ed. 2014) ............................................................... 25

PL 108-159 (December 4, 2003)............................................22

S. Rep. No. 103–209 (1993) ...................................................21

# STATEMENT OF JURISDICTION

On December 20, 2022,[1] Shelby Roberts ("Roberts") filed a Complaint in the United States District Court for the Middle District of North Carolina alleging that Carter-Young, Inc. ("Carter-Young") violated its obligations under the Fair Credit Reporting Act (FCRA), 15 U.S.C. §1681s-2(b), by willfully failing to reasonably investigate her dispute of a "debt" [2] that Carter-Young had reported to the major consumer reporting agencies ("CRAs" or "agencies") and by continuing to verify the debt despite knowing that the debt was purely fictitious. (JA 4-19).[3] Roberts sought to recover actual damages, punitive damages, and reasonable attorney fees.

The District Court had jurisdiction pursuant to 15 U.S.C. §1681p and 28 U.S.C. §1331. Pursuant to the District Court's Standing Order No. 30, the case was referred to United States Magistrate Judge L. Patrick Auld to conduct all proceedings and rule initially on all motions, including dispositive motions. (JA 1). On February 21, 2023, Carter-Young filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (JA 20-22). The motion was fully briefed, (JA 23-62), and on July 6, 2023, the Magistrate Judge issued a decision recommending that

---

[1] All dates are 2022 unless otherwise indicated.

[2] Roberts uses the term "debt" throughout this brief for ease of reference. However, the "debt" was fictitious and nonexistent.

[3] References are to the Joint Appendix page number(s).

the motion be granted. (JA 63-84). On July 19, 2023, Roberts filed timely Objections to the Magistrate Judge's Recommended Decision. (JA 85-107). Carter-Young filed a response in support of the recommended decision on August 2, 2023. (JA 108-119). Eight days later, on August 10, 2023, United States District Court Judge William L. Osteen, Jr. issued an Order adopting the Magistrate Judge's Recommended Decision in its entirety. (JA 120-121). That same day the District Court entered judgment dismissing the case. (JA 122-123).

The District Court's Order and Judgment is a final decision that disposes of all issues. On August 29, 2023, Roberts filed her notice of appeal to this Court. (JA 123-124). This notice was timely as it was filed within thirty days of the District Court's Order and Judgment. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES

1.      Whether the Complaint states a plausible claim for relief under 15 U.S.C. §1681s-2(b)(1)? [4]

2.      Whether this Circuit will recognize an exception to a furnisher's obligations under §1681s-2(b)(1) if the consumer's dispute asserts a "legal" defense to the reported debt? [5]

---

[4] All subsequent statutory citations are to Title 15, U.S. Code.

[5] For ease of reference, Roberts will refer to this as the "legal dispute" exception.

3. If Issue number 2 is answered in the affirmative, (a) what distinguishes a "legal" from a "factual" dispute? (b) Does the need to consult an underlying legal document or be cognizant of undisputed legal principles render the dispute "legal?" (c) Does the identity of the furnisher (creditor or third party) have any legal significance? (d) Does the Complaint, fairly construed, allege plausible factual challenges to the debt?

## STATEMENT OF CASE

A. <u>Material Facts</u> [6]

From November 2019 through January 10, 2021, Roberts resided in an apartment complex located in Arden, North Carolina (hereafter referred to as "Ansley"). (JA 5, ¶ 8). Roberts and Ansley were parties to a written lease agreement with an initial term through September 10, 2020. (JA 5, ¶ 9). The lease was extended for 60 days through November 10, 2020, at which point it became a month-to-month tenancy terminable by either party with thirty-days written notice. (JA 5, ¶ 10).

Without giving the required written termination notice, Ansley agreed to lease Roberts' apartment to a third party, effective December 12, 2020. (JA 5, ¶ 11). When Ansley belatedly notified Roberts she would have to vacate the apartment by that date, Roberts resisted, asserting that Ansley's failure to give timely written notice

---

[6] The facts are those stated in the Complaint with all reasonable inferences drawn in favor of Roberts.

had resulted in the lease being automatically extended through January 10, 2021. As a result of Roberts exercising her legal rights, Ansley was forced to breach its agreement with the third-party, causing Ansley embarrassment and potential financial liability. (JA 5-6, ¶¶ 12-13).

After Roberts vacated the apartment on January 10, 2021, Ansley retaliated by seeking to charge her for damages to the apartment that either never occurred, were grossly overstated, or were ordinary "wear and tear" items. In addition to retaining Roberts' $500 security deposit,[7] Ansley sent Roberts an invoice in the amount of $791.14 for alleged damages not covered by the security deposit. (JA 6, ¶¶ 14-15). There were two components to the $791.14 invoice. The largest component, exceeding $500, was a charge for the cost of a new stove. Ansley made no claim that the stove itself had been damaged. Instead, it sought to justify this charge because the oven door handle had become detached. Consistent with established practice, Roberts had reported the detached handle to maintenance and had requested it be reattached. And in fact, the door handle was easily reattached simply by reconnecting the screws. Ansley never replaced the stove and never purchased a new stove. (JA 6, ¶¶ 15-17). The second component of the $791.14 invoice consisted of miscellaneous damages (above and beyond those covered by

---

[7] The damages covered by the security deposit are not placed in issue by the Complaint.

the security deposit), which either never occurred, were grossly exaggerated, or were ordinary wear and tear items. (JA 7, ¶ 19).

Roberts refused to pay the invoice, asserting it was factually bogus, fraudulent, and retaliatory. (JA 7, ¶ 20). Ansley then referred the debt to Carter-Young, a debt-collector with whom it had a business relationship. (JA 4, ¶ 4; 7, ¶¶ 21-23). In March 2021, Carter-Young sent Roberts a "Collection Notice," seeking to collect the $791.14 debt. Roberts disputed the debt in writing, asserting that it was retaliatory and false.[8] (JA 8, ¶¶ 24-25). Carter-Young then reported the $791.14 debt to the three major CRAs as a valid, albeit "disputed," debt that was in collections. (JA 8, ¶ 26).

In July/August 2022, Roberts, who was living in Knoxville, Tennessee, placed her house on the market for sale. She planned to relocate to Roanoke, Virginia, and was looking to rent an apartment. During this process, Roberts learned that the reporting of the $791.14 debt would likely prevent her from renting a residential apartment, as few, if any, apartment complexes will rent to a person who has a collection matter with another apartment. (JA 8-9), ¶¶ 27-29). This triggered Roberts to file a formal dispute of the $791.14 debt with Experian on August 2, alleging that

---

[8] This and all subsequent *written* communications with Carter-Young were from/to Roberts' attorney, who is her father and was a guarantor on the lease with Ansley. As all such communications were on behalf of Roberts, they are designated herein as from/to her.

the debt was fraudulent and retaliatory. Experian promptly reported this dispute to Carter-Young. Roberts filed similar disputes with Equifax and Trans Union, which were also promptly reported to Carter-Young. (JA 9, ¶¶ 30-31).

Rather than conduct an actual investigation, Carter-Young merely requested its client Ansley to recertify the debt. Receiving such recertification, Carter-Young reverified the debt to the major CRAs on or about August 8. (JA 9, ¶ 32). Thereafter, on multiple occasions in August and September, Roberts refiled formal disputes with the major CRAs, who again reported these disputes to Carter-Young. And without conducting any meaningful investigation, Carter-Young reverified the debt. (JA 10, ¶¶ 35-36). Had Carter-Young conducted even a rudimentary investigation, it would have discovered that the debt "was on its face preposterous, fraudulent, and very likely retaliatory." (JA 9, ¶ 33).

In early to mid-September, the issue became more urgent as Roberts entered into a contract to sell her house, with a closing date of October 12. As Roberts could not obtain residential rental housing while the $791.14 debt remained on her credit report and Carter-Young was refusing to do anything other than parrot back its client's position, Roberts faced the prospect of being homeless on October 12. (JA 10, ¶ 37). Roberts' options were limited. Recognizing that Carter-Young was being controlled by Ansley, she concluded that the only conceivable avenue for getting the debt removed from her credit report in a timely fashion was to file a "small claims"

lawsuit against Ansley in state court, raising claims under the North Carolina Debt Collection Practices Act (NCDCPA), N.C.G.S. §§ 75-50 et. seq., which she did on September 20. Although Carter-Young was not a party, Roberts hoped this suit would cause Ansley to compel Carter-Young to delete its reporting of this fictitious debt. A hearing before a Magistrate Judge was scheduled for October 7. (JA 10-11, ¶¶ 38-39).

On September 21, Roberts called Carter-Young directly and informed the manager of the Ansley lawsuit. Carter-Young's manager expressed a willingness to investigate. Later that day, Roberts sent Carter-Young an email, attaching a copy of the lawsuit and describing her contention that the claim was fraudulent and retaliatory. On September 22, Carter-Young's manager responded: "We are in receipt of your email communication and have forwarded the same to our client for review." (JA 11, ¶¶ 40-42).

On or about September 24, Roberts submitted a copy of the Ansley lawsuit to Experian, and Experian independently forwarded this information to Carter-Young. On September 26, Roberts sent Carter-Young another email providing additional explanation and suggesting the matter could be resolved with Carter-Young if it would temporarily block or delete the reporting of this claim pending resolution of the Ansley lawsuit. On September 27, Carter-Young's manager responded: "Are you willing to withdraw the suit?" Roberts responded that her dispute with Carter-Young

was separate from the lawsuit against Ansley, Carter-Young was not a party to this lawsuit, and Carter-Young had independent FCRA obligations. Roberts questioned the reasonableness of Carter-Young's actions, invited it to submit any evidence it had to validate the debt, and stated that if Carter-Young continued to act in lockstep with its client, Roberts would be forced to pursue litigation against Carter-Young under the FCRA. (JA 11-12, ¶¶ 43-47).

Carter-Young never responded, and on September 30, it again reverified the $791.14 debt, despite lacking evidence that would prove the debt. (JA 12, ¶ 48). This was particularly true regarding the $500+ charge for a new stove. By this time, Carter-Young had been informed that no damage occurred to the stove, the oven door handle was reattached by its screws in a matter of minutes, and Ansley did not purchase or install a new stove. Thus, it either knew, or willfully ignored, that this charge was false, fraudulent, and retaliatory. (JA 12-13, ¶¶ 48, 50).

On October 2, as a last-ditch effort, Roberts sent Carter-Young an initial draft of an FCRA complaint she was prepared to file against Carter-Young unless it submitted persuasive evidence to validate the debt or blocked or deleted the reporting of the $791.14 debt pending resolution of the Ansley lawsuit. Carter-Young ignored this email. (JA 10, ¶¶ 51).

On October 7, at a hearing before a Magistrate, Ansley and Roberts reached an oral settlement agreement (later reduced to writing) of Roberts' legal claims

against Ansley. As part of this agreement, Ansley agreed to abandon the $791.14 debt and to instruct Carter-Young to report the debt as invalid and to delete it from Roberts' credit record. On October 7, acting solely at its client's direction, Carter-Young reported the debt as invalid and requested that it be deleted. (JA 10, ¶¶ 52-54).

B. Roberts' Legal Claims

Roberts alleged in her Complaint that she, as a consumer (§ 1681a (c)), filed disputes with the major CRAs on multiple occasions in August and September along with substantial relevant information, and that these agencies notified Carter-Young of these disputes. (JA 14-15, ¶¶ 59-64). This triggered Carter-Young's obligation to conduct a reasonable investigation of the disputes (§1681s-2(b)(1)(A)) and, if any information is found to be inaccurate, incomplete, or incapable of being verified either modify, delete, or permanently block the reporting of that item of information. (§1681s-2(b)(1)(E)). (JA 15, ¶ 65). Carter-Young made no effort to investigate the facts raised by Roberts and deferred exclusively to the desires of its client. It ignored the facial implausibility of the debt, linked its willingness to honor its FCRA obligations to Roberts' willingness to drop her legal claims against Ansley, and reverified the $791.14 debt even after it affirmatively knew the debt was false and unfounded, for the specific purpose of causing Roberts to compromise or dismiss her legal claims against Carter-Young's client. (JA 15-16, ¶¶ 66-72).

Roberts alleged that Carter-Young's conduct was willful, intentional, and knowing, or at least reckless. As a proximate result, Roberts suffered actual damages, including an extended inability to be approved for residential rental housing, increased out-of-pocket expenses and costs, damage to her reputation and credit, and emotional distress. (§1681n(a)(1)). Roberts further sought to recover punitive damages (§1681n(a)(2)) and reasonable attorney fees (§1681n(a)(3)). [9] (JA 17, ¶¶ 73-79).

## C. The District Court's Decision

On February 21, 2023, Carter-Young filed a Rule 12(b)(6) motion to dismiss, arguing that the Complaint failed to state a viable claim for relief because Roberts' dispute raised a "legal" defense to the debt, which Carter-Young had no obligation to investigate. Carter-Young contended that in order to investigate Roberts' dispute, it would have been required "to make legal conclusions that Ansley retaliated against Roberts or committed fraud," (JA 30), and "would have been required to make a legal determination as to the lease terms and applicability of state law." (JA 31). Roberts argued in response that the Complaint clearly asserted challenges to the factual accuracy of the debt, there were no underlying disputed legal questions, and in any event, this Court had never applied the factual/legal dispute distinction in any

---

[9] Alternatively, Roberts alleged that Carter-Young negligently violated its FCRA obligations. (JA 18, ¶¶ 80-83).

case and had strongly suggested (if not directly held) that this distinction had no application in cases such as this. *Saunders v. BB&T Co. of Virginia,* 526 F.3d 142, 150 (4th Cir. 2008). (JA 35-56).

The District Court, adopting the Magistrate Judge's recommendation, granted the motion, albeit on reasoning more expansive than that proffered by Carter-Young. First, the District Court concluded that the "prevailing view" was that furnishers of information have no obligation to investigate a consumer's indirect dispute of a debt if the dispute presents a "legal" defense to the debt. (JA 72-75, JA 77-80).

Second, the District Court opined:

> In deference to the prevailing view, the Court should conclude that Plaintiff failed to state a FCRA claim because her disputes regarding the debt rest on legal contentions rather than factual inaccuracies. *As detailed throughout the Complaint, Plaintiff does not contest that she resided at Ansley, that Ansley sent her an invoice for damages after she vacated her apartment, or that she refused to pay said invoice. . . .*"

(JA 74) (Emphasis added).

Although the import of the highlighted language is not entirely clear, the District Court apparently believed that a creditor's invoice is determinative and that if the furnisher *accurately reports the invoice*, there is no factual inaccuracy even if the damages cited never occurred or were grossly overstated and the invoice was fraudulent. Further, in rejecting Roberts' argument that Carter-Young could have investigated whether the damages actually occurred, were grossly exaggerated, or

constituted ordinary "wear and tear," the District Court concluded that Carter-Young would have been required:

> to refer to Plaintiff's lease or state law. Absent reference to applicable legal principles, these phrases represent nothing more than conclusory labels. Put another way, even if Defendant had found fault with some or all of the charges comprising the Ansley debt, the **fact** of Plaintiff's debt to Ansley would have remained unchanged; Defendant holds neither the statutory obligation nor authority to extinguish a consumer's debt. Ergo, Plaintiff did not identify a factual inaccuracy with the report, and instead sought to (impermissibly) leverage the FCRA to collaterally attack her debt with Ansley.

(JA 82) (Emphasis included).

The District Court also interpreted this Court's decision in *Saunders* as *limiting* a furnisher's legal obligation to *reporting the fact of the dispute.* In the District Court's view, the furnisher has no obligation to inquire into the *merits of the dispute* as the "merits of consumer's dispute regarding debt lack relevance to furnishers' investigatory function." (JA 78).

The District Court identified what it believed were two legal questions placed in issue by the Complaint: (1) "whether Ansley could charge Plaintiff the full replacement value of a stove when the alleged damage consisted of a broken door handle," and (2) whether Ansley could retain Roberts' security deposit for ordinary wear and tear. (JA 80). The District Court further concluded that Roberts' allegations that the debt was fraudulent and retaliatory "would require Defendant's

interpretation and application of a legal instrument (Plaintiff's lease) or state law," thereby creating a legal dispute. (JA 81), and that her small-claims lawsuit against Ansley supported the conclusion that she was collaterally attacking the debt. (JA 76-77, 83). Finally, although Roberts specifically challenged both the existence and amount of the debt, the District Court, throughout its Decision, recharacterized these allegations as "legal," rather than "factual" challenges to the debt. (JA 69-83 & n. 1, 2).

## SUMMARY OF ARGUMENT

The FCRA is a consumer protection statute that this Court construes liberally. *Curtis v. Propel Property Tax Funding, LLC,* 915 F.3d 234, 239 (4th Cir. 2019). When a consumer disputes information in her credit file with a CRA and the CRA notifies the person who furnished this information of the consumer's dispute, §1681s-2(b)(1) obligates the furnisher to conduct a "reasonable" investigation of the dispute, *Johnson v. MBNA America Bank, NA,* 357 F.3d 426, 429-430 (4th Cir. 2004), and to take "appropriate" action. *Guthrie v. PHH Mortgage Corp.,* 79 F.4th 328, 345 (4th Cir. 2023). This obligation is mandatory, and the statute contains no exceptions. The required investigation cannot be superficial. A "reasonable" investigation requires a "searching inquiry" into the merits of the dispute, *Johnson,* 357 F.3d at 430, to determine whether the disputed information can be affirmatively "verified," i.e., proved as valid. *Hinkle v. Midland Credit Mgmt., Inc.,* 827 F.3d 1295, 1302-1303

(11th Cir. 2016). The statute gives the consumer the benefit of the doubt and if the investigation either (1) establishes that the disputed information is inaccurate or (2) proves inconclusive, the furnisher "shall" delete, modify, or permanently block the reporting of this information. §1681s-2(b)(1)(E). If a furnisher fails to meet its obligations, the consumer may recover actual damages and reasonable attorney fees, and if the violation is willful, she may recover punitive damages. §§1681(n), (o).

This is not a close case, and the facts are egregious. Ansley, Roberts' landlord, angered by her exercise of certain rights under the lease agreement, fabricated a debt in the amount of $791.14. When Roberts refused to pay, Ansley contracted with Carter-Young to collect the debt. Roberts first disputed the debt directly with Carter-Young, and after Carter-Young reported the debt to the major CRAs, she later disputed the debt with the CRAs, who notified Carter-Young of the dispute. Over a period of roughly sixty days, Roberts, both through the CRAs and in direct communications with Carter-Young's manager, provided substantial information establishing the factually bogus nature of the debt. Specifically, Roberts alleged that the debt included a $500+ charge for a new stove even though: (1) the stove was not damaged, (2) the oven door handle (which had become detached) was reattached by Ansley's maintenance department in a matter of minutes, (3) Ansley did not replace the stove in Roberts' apartment, and (4) Ansley did not purchase a new stove. Regarding the remaining miscellaneous "damages" comprising the $791.14 debt,

Roberts asserted that these damages either never occurred, were grossly overstated, or constituted ordinary wear and tear.

In response, Carter-Young conducted no investigation, but simply referred the dispute to its client (Ansley) and acted thereafter as Ansley's puppet. Thus, it continued to verify the debt to the CRAs. Unable to obtain relief from Carter-Young and on the verge of being homeless on October 12, Roberts filed a small-claims lawsuit against Ansley under the NCDCPA. Carter-Young was not a party to this lawsuit. Facing a hearing before a magistrate on October 7, Ansley directed Carter-Young to verify the debt yet again, and it did so on September 30, even though it lacked any documentation (or other evidence) to verify the debt, particularly the charge for a new stove. Carter-Young's actions were motivated solely by its desire to protect its financial relationship with Ansley and to ratchet up the pressure on Roberts to settle her lawsuit with Ansley on terms favorable to Ansley. To this end, Carter-Young sought to negotiate on behalf of Ansley and it linked its willingness to take appropriate action to Roberts withdrawing her lawsuit against Ansley. When Roberts refused to link its claims against Ansley with its request that Carter-Young comply with its FCRA obligations, Carter-Young responded by reverifying the debt even though by this time it knew that the $791.14 debt was bogus and lacked the requisite factual support. Only after Roberts and Ansley resolved the small claims lawsuit at the magistrate hearing on October 7 did Carter-Young finally report the

debt as invalid, and it did so only because it was directed by Ansley to do so. But by this time, considerable damage had been done. The time remaining before Roberts' house was set to close was too short to obtain residential rental housing, resulting in Roberts sustaining excess out-of-pocket expenses. Further, the prospect of being homeless and the refusal of Carter-Young to honor its FCRA obligations had caused Roberts sixty days of unrelenting emotional distress. Believing that Carter-Young had acted willfully, abusively, and in complete disregard of its FCRA obligations, Roberts filed this lawsuit under §1681s-2(b)(1), seeking actual damages, punitive damages, and reasonable attorney fees.

Against this factual background, the District Court's Rule 12(b)(6) dismissal is patently indefensible and cannot survive this Court's de novo review. Roberts plausibly alleged all essential elements of a §1681s-2(b) claim. Indeed, these allegations, if proved true, state a violation as a matter of law.

In concluding that the Complaint should be dismissed, the District Court misconstrued the statute in material respects. Where, as here, a consumer alleges that a debt is fictitious and retaliatory and provides supporting information, a furnisher does not, as the District Court apparently believed, satisfy its statutory obligations simply by accurately reporting a creditor's "invoice" and including a notation that the debt is "disputed." This is not the type of searching inquiry required by this Court's precedents, and the FCRA is not merely concerned with "transcription

errors." *Sessa v. Trans Union, LLC,* 74 F.4th 38, 43 (2d Cir. 2023). Unless the furnisher is able to "conclusively verify" the debt, it must delete or block its reporting of the debt. *Johnson,* 357 F.3d at 432.

The District Court's primary basis for dismissing the Complaint was its application of what is at its core a non-statutory "legal dispute" exception. There is essentially no support among the circuit courts of appeals for this exception as applied to furnishers. The Ninth Circuit has rejected the exception as applied to furnishers, *Gross v. CitiMortgage, Inc.,* 33 F.4th 1246 (9th Cir. 2022), and the Second Circuit has rejected it even as applied to CRAs, *Sessa,* 74 F.4th at 42-43. The Seventh and Tenth Circuits have applied the exception to agencies, but only because "legal" disputes and questions are more appropriately directed to and investigated by furnishers. *Denan v. Trans Union LLC,* 959 F.3d 290, 294 (7th Cir. 2020); *Wright v. Experian Information Solutions, Inc.,* 805 F.3d 1232, 1242 (10th Cir. 2015). This Court has never recognized any non-statutory exception in any FCRA case, whether brought against an agency or a furnisher. In *Saunders,* while not directly addressing the exception, this Court suggested that furnishers play a different role from CRAs and are not excused from investigating "legal" disputes. *Saunders,* 526 F.3d at 150. And in *Guthrie,* 79 F.4th at 345, this Court held that a consumer's evidence was sufficient to go to the jury even though the underlying dispute revolved around the

import of bankruptcy law and a bankruptcy court decision. Nothing in this Court's FCRA jurisprudence supports application of a legal dispute exception to furnishers.

Indeed, the legal dispute exception, as applied to furnishers, is illogical, inconsistent with the statute, and would create a massive gap in the Act's coverage. As amended in 2003, §1681s-2(b)(1) "is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information." *Hinkle,* 827 F.3d at 1304. Thus, a furnisher, faced with a consumer's dispute, whether "legal" or "factual," is not required to conclusively resolve that dispute. Unless it can conclusively verify the disputed information, it must delete or block the reporting of such information. This does not extinguish the debt in any legal sense; it merely precludes it from being reported on a consumer's credit report. *Id.* Roberts requests that this Court reject any categorical exception for legal disputes.

Assuming that this Court finds the "legal dispute" exception applicable to furnishers, the exception is a narrow one that has no application here. Roberts' Complaint does not clearly disclose any legal dispute or any underlying legal question. To the contrary, she disputed the entire factual underpinning of the $791.14 debt, both its existence and its amount. There was much that Carter-Young could have investigated, but chose not to because its sole goal was to protect the interests of its client. Because Carter-Young repeatedly "verified" the debt, "the question of

whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved for trial." *Id.* at 1303.

The District Court erred in dismissing the Complaint on its face. Roberts requests that this Court reverse and remand for further proceedings.

## ARGUMENT

### STANDARD OF REVIEW

This Court "review[s] de novo the district court's grant of [Carter-Young's] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC,* 80 F.4th 466, 472 (4th Cir. 2023). The court accepts the truth of all factual allegations in Roberts' Complaint and draws all reasonable inferences in her favor. *Id.* Although "detailed factual allegations" are not required, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007), the complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the pleader pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

<u>DISCUSSION OF ISSUES</u>

A. <u>Roberts Plausibly Alleges That Carter-Young Violated Its Obligations Under FCRA §1681s-2(b)(1).</u>

The ultimate question presented to this Court for de novo review is whether the Complaint, construed in Roberts' favor, plausibly alleges that Carter-Young violated §1681s-2(b)(1). As shown below, the Complaint plausibly alleges all essential elements of a §1681s-2(b)(1) claim.

1. <u>FCRA Is A Consumer Protection Statute That Is Interpreted Liberally.</u>

"Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." *Dalton v. Capital Associated Industries,* 257 F.3d 409, 414 (4th Cir. 2001). "The legislative history of the FCRA indicates that its purpose is to protect an individual from inaccurate or arbitrary information about himself in a consumer report that is being used as a factor in determining the individual's eligibility for credit, insurance, or employment." *Pinner v. Schmidt,* 805 F.2d 1258, 1261 (5th Cir. 1986). "In essence, the purpose of the FCRA is clear: to help consumers like [Roberts] navigate the often opaque and occasionally exasperating universe of credit reporting and seek redress where necessary." *Ingram v. Experian Information Solutions, Inc.,* 83 F.4th 231, 237 (3d Cir. 2023). As a "remedial consumer protection statute," the FCRA is interpreted "liberally" in a manner that

protects consumers, *Curtis,* 915 F.3d at 239, and reflects FCRA's "broad remedial purposes." *Hoke v. Retail Credit Corp.,* 521 F.2d 1079, 1082 n. 7 (4th Cir. 1975).

2. <u>Congress Amended FCRA In 1996 And Again In 2003 To Impose Obligations On Furnishers Of Information.</u>

As originally enacted, FCRA regulated CRAs, but not those who furnished the information being reported by these agencies. As part of the Consumer Credit Reporting Reform Act of 1996, FCRA was amended "to add a new section describing the responsibilities of furnishers, in attempt to close a 'gap in the FCRA's coverage,' that had previously allowed furnishers to 'irresponsibly' frustrate a consumer reporting agency's efforts to verify inaccurate information, while still avoiding liability." *Ingram,* 83 F.4th at 242 (citing S. Rep. No. 103–209, at 6 (1993)). "The expansion of the FCRA's coverage makes particular sense because it is creditors and other furnishers of information, not consumer reporting agencies, that have direct access to the facts of a given credit transaction." S. Rep. No. 103-209, at 6 (1993) (quoting testimony of FTC's Director of Credit Practices).

The FCRA permits consumers to dispute credit information either directly with the furnisher ("direct" dispute) or indirectly through the agencies ("indirect" dispute). *Ingram,* 83 F.4th at 237. Although furnishers are generally required to investigate both types of disputes, there is a private right of action only for indirect disputes; i.e., when a furnisher is notified by a CRA that a consumer has disputed "the completeness or accuracy of any information provided by" the furnisher to the

CRA. In such cases, §1681s-2(b)(1) imposes legal obligations on the furnisher that are enforceable in private actions under §1681n (willful violations) and §1681o (negligent violations).

Section 1681s-2(b)(1), as amended in 1996, provided that, upon being notified by a CRA of a consumer's indirect dispute, the furnisher "shall":

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

In 2003, Congress further amended FCRA through the Fair and Accurate Credit Transactions Act of 2003. PL 108-159 (December 4, 2003). Section 1681-s 2(b)(1) was amended to add the following subparagraph (E):

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete *or cannot be verified after any reinvestigation* . . . promptly— (i) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information."

(Emphasis Added).

3. <u>A Furnisher Is Obligated To Conduct A Reasonable Investigation Of A Consumer's Indirect Dispute And If It Determines That The Disputed Information Is Inaccurate, Misleading, Or Incapable Of Being Verified, It Shall Modify Or Delete Its Reporting Of That Information.</u>

The obligations of a furnisher, faced with an indirect dispute, are clearly established. First, the furnisher must "investigate" the dispute. This investigation is mandatory. In *Johnson,* this Court was one of the first circuit courts to define the type or scope of the "investigation" required by §1681s-2(b)(1). In that case, the consumer disputed a $17,000 credit card debt, contending the debt belonged solely to her husband. The bank, which was both creditor and furnisher, limited its investigation to certain internal data bases because its agents "never consult underlying documents such as account applications." 357 F.3d at 431.  A jury concluded that the furnisher's investigation was unreasonable and awarded the consumer damages. On appeal, the furnisher contended that the statute imposed only minimal obligations on it, and that it satisfied these obligations. This Court disagreed, holding that the investigation obligation imposed on furnishers "requires some degree of careful inquiry by creditors." *Id.* at 430. An "investigation" requires that the furnisher make a "detailed inquiry or systematic examination" and "a searching inquiry."  *Id.* "It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and ultimately correct— inaccurate information on their credit reports, Congress used the term 'investigation'

to include superficial, *un* reasonable inquiries by creditors." *Id.* at 430-431. (Emphasis included).

In *Saunders,* 526 F.3d at 148 (4th Cir. 2008), this Court held that the FCRA was concerned not merely with inaccurate information in a consumer's credit report, but also with "omissions that render the information misleading." *Id.* In *Daugherty v. Ocwen Loan Servicing, LLC,* 701 Fed. Appx. 246, 253 (4th Cir. 2017), this Court held that the reasonableness of a furnisher's investigation turns on "an evaluation of information within the furnisher's possession, such as correspondence between the consumer and the furnisher, the data identified by the reporting agency as disputed, and the furnisher's other records relating to the disputed account."

Second, a furnisher's obligations are not limited to conducting a "reasonable" investigation. The furnisher must also take "appropriate" action based on that investigation. *Guthrie,* 79 F.4th at 345) ("a reasonable jury could conclude that [furnisher] failed to appropriately respond to errors showing a delinquent balance for prior reporting periods.") Section 1681s-2(b)(1)(E) establishes "three potential ending points to reinvestigation: verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that information 'cannot be verified.'" *Hinkle,* 827 F.3d at 1302. Only if the furnisher's reasonable investigation affirmatively verifies the disputed information may the furnisher continue to report this information. If the furnisher determines that the disputed information is (1)

inaccurate, (2) incomplete, or (3) incapable of being verified, the furnisher shall modify, delete, or block its reporting of this information. Thus, the "plain text" of §1681s-2(b) "requires furnishers to either 'verif[y]' disputed information by means of an 'investigation' or inform the CRAs that the information 'cannot be verified.'" *Id.* at 1302. *See Johnson,* 357 F.3d at 432 ("jury could reasonably conclude that if the MBNA agents no longer had the application, they could have at least informed the credit reporting agencies that MBNA could not conclusively verify that Johnson was a co-obligor.")

The FCRA does not define the term "verified." However, in *Hinkle*, the Eleventh Circuit, citing *Black's Law Dictionary* 1793 (10th ed. 2014) ("verify vb. (14c), defined "verify" as "1. To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate. 2. To confirm or substantiate by oath or affidavit; to swear to the truth of." *Id.* at 1302-1303. If a furnisher verifies disputed information, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved for trial." *Id.* at 1303.

4. Roberts Clearly Alleged All Essential Elements Of A §1681s-2(b)(1) Claim.

Measured against these precedents, Roberts plausibly alleged that Carter-Young violated §1681s-2(b)(1). On multiple occasions, she disputed the debt with

the CRAs, who reported the disputes to Carter-Young. This triggered Carter-Young's §1681s-2(b)(1) obligations. In support of her dispute Roberts alleged that Carter-Young's client, Ansley, had fabricated the debt out of thin air and she provided a plausible reason why it would do so for retaliatory purposes. She proffered facts showing that the greater part of the debt was on its face preposterous and without any factual support, to wit, the charge for a new stove when there was no damage to the stove, the detached oven door handle was easily reattached in minutes, and the stove was never replaced. Roberts further alleged in her Complaint that Carter-Young made no independent inquiry or investigation, but simply referred the matter to its client for review, and then parroted back its client's predictable response. Further, it acted in lockstep with its client to protect Ansley's interests in a separate small-claims lawsuit to which Carter-Young was not a party. Knowing that Roberts' home was being sold and that she faced the prospect of being unable to rent an apartment when her house sold, Carter-Young reverified the debt to the CRAs in order to ratchet up the pressure on Roberts to resolve her dispute with Ansley. The proposition that these allegations fail to plausibly allege a violation of §1681s-2(b)(1) is itself implausible. Indeed, if true, these allegations state a violation as a matter of law.

Particularly instructive, given the nature of Roberts' allegations, are the Fifth Circuit's decision in *Pinner* and the Eleventh Circuit's decision in *Hinkle*. In *Pinner,*

a decision this Court has cited approvingly (*Johnson,* 357 F.3d at 431; *Saunders,* 526 F.3d at 148-149), Pinner maintained a personal charge account with his employer. The account reflected a balance of $171.11, but Pinner contended his manager "had entered several fictitious charges on his account" because of the manager's jealousy over Pinner's relationship with a female employee, and that the correct amount was $121.71. 805 F.2d at 1260. The debt was reported to Chilton, a CRA. [10] Pinner disputed the debt and explained his history with the manager. Chilton, however, limited its inquiry to consulting the manager, after which it reverified the debt. The Fifth Circuit upheld the jury's finding that Chilton violated its FCRA obligations by its limited inquiry and held that if there was no one other than the manager available to verify the account, Chilton "should have deleted the information altogether." *Id.* at 1262.

In *Hinkle,* Midland Credit acquired two "junk debts," one attributed to "Terri Hinkle" and a second attributable to "Teri Hinkle." Midland attempted to collect the debts from the plaintiff, Teri Lynn Hinkle, but she disputed that the debts belonged to her. Thereafter, Midland reported the debts to the CRAs as "assigned to internal or external collections." After Hinkle disputed the debts with the CRAs, Midland

---

[10] *Pinner* was decided before the FCRA was amended to place obligations on furnishers. Thus, Pinner was limited to pursuing claims against Chilton, a CRA. This distinction is not significant as "the same standard of accuracy applies to a furnisher's response under §1681s-2." *Saunders,* 526 F.3d at n. 3.

rechecked its own internal records but did not request any account-level documentation from the original creditors. Instead, it verified the debts. Hinkle sued Midland under §1681s-2(b). The district court granted summary judgment for Midland, but the Eleventh Circuit reversed. Under the analytical framework established in *Johnson,* the Eleventh Circuit concluded that a reasonable jury could find that Midland's "cursory investigation was unreasonable," that "the documentation Midland reviewed was insufficient to prove" that the accounts belonged to the consumer, and that "Midland therefore had a duty to report the accounts as "cannot be verified.'" *Id.* at 1305.

Here, like *Pinner,* Roberts alleged that Ansley's manager fabricated a debt for retaliatory reasons, and she provided specific context and details. Rather than investigate these allegations, Carter-Young simply deferred to the instructions of Ansley and its manager. And like *Hinkle,* when Carter-Young verified the debt on September 30, it was asserting that it had evidence sufficient to *prove* the validity of the entire $791.14 debt. Yet it lacked any sufficient documentation that would support the debt. In these circumstances, Carter-Young was required to delete or modify its reporting of the debt as either "invalid" or "unable to verify." However, it did the exact opposite. This constitutes a violation of §1681s-2(b)(1) as a matter of law.

5. The District Court Misconstrued The Scope Of A Furnisher's Obligations Under §1681s-2(b)(1).

Although the District Court's decision is primarily premised on its application of a legal dispute exception, in its analysis of the scope of a furnisher's §1681s-2(b) obligations, the court draws several patently erroneous conclusions, which, if adopted, would place consumers at the mercy of unscrupulous creditors and other furnishers of information. *First*, the District Court interpreted the FCRA and this Court's *Saunders* decision as establishing that a furnisher has no obligation to investigate the *merits* of a consumer's indirect dispute. Its sole obligation is to report the *fact* of the dispute. (JA 77-80). *Second*, the District Court held that a creditor's "invoice" is dispositive of the debt and a furnisher's reporting of that invoice is *accurate* as a matter of law. (JA 74). *Third,* the District Court deemed it significant that Carter-Young was not the actual creditor. (JA 79). Each conclusion is erroneous as a matter of law. And in combination they improperly limit the scope of §1681s-2(b) "to cases involving transcription errors." *Sessa,* 74 F.4th at 42 (rejecting similar conclusion in §1681e(b) cases).

*Saunders* involved a complex set of facts, but in a nutshell, Saunders became delinquent on a loan because of a snafu on BB&T's part. His §1681s-2(b)(1) claim was premised not on a contention that the information reported was technically inaccurate, but on the contention that BB&T's failure to report that he "disputed" the debt rendered the information misleading. This Court agreed, holding that this

omission was misleading and that BB&T had an obligation to report that Saunders disputed the delinquency. But the *Saunders* court did not suggest, much less hold, that this represented the full extent of a furnisher's §1681s-2(b) obligations in every case where a consumer disputes a debt. The scope of a furnisher's obligations turns on the nature and substance of the consumer's dispute and the information provided to the furnisher. *Daugherty,* 701 Fed. Appx. at 253.  Nor does *Saunders* suggest, or hold, that a furnisher may ignore the merits of the consumer's dispute, provided only that it report that the debt is disputed.

Indeed, to read *Saunders* as *limiting* a furnisher's obligations in such a manner would eviscerate this Court's holdings in cases such as *Johnson, Daugherty,* and *Guthrie.* A furnisher is required to conduct a "reasonable" investigation of a consumer's "dispute." The consumer, not the furnisher, defines the nature of the dispute. The purpose of the investigation is "to determine whether the dispute can be verified," *Johnson,* 357 F.3d at 431, and if the furnisher cannot "conclusively verify" the disputed information, it must delete or modify that information in the consumer's file. *Id.* at 432. Here, unlike *Saunders,* Roberts' dispute was not premised on an *omission* or a failure to note that she disputed the debt. Her dispute alleged that the entire debt was fictitious and should not even appear on her credit report. In cases like this, a reasonable investigation necessarily requires an inquiry into the merits of the dispute. *See Guthrie,* 79 F.4th at 345 (furnisher arguably violated

§1681s-2(b) by reporting that consumer was delinquent at various time when consumer's mortgage had been discharged by bankruptcy); *Johnson,* 357 F.3d at 431-432 (furnisher failed to reasonably investigate whether, in fact, consumer was a co-obligor on account).

The District Court's view that because Ansley sent Roberts an "invoice" in the amount of $791.14 and Carter-Young reported that amount as owed, Carter-Young accurately reported the debt and had no further obligation to investigate Roberts' dispute is completely incompatible with this Court's FCRA decisions. That Ansley created an "invoice" in the amount of $791.14 to support the "debt" is hardly conclusive. This "invoice" was an after-the-fact document that does not bear Roberts's signature and it was immediately disputed by Roberts. By itself, it only proves Ansley's *contention* that Roberts owed the debt. Carter-Young's obligation was to dig deeper to assess whether the "damages" claimed on the invoice were fictitious as Roberts alleged or supported by something other than Ansley's contention such as, for example, an actual invoice from a third party showing that Ansley replaced the stove in Roberts' apartment with a new stove. *See Pinner,* 805 F.2d at 1260-1262 (agency required to investigate dispute asserting that employer's

invoice was inaccurate and that manager fabricated charges for retaliatory reasons). Of course, no such document exists because the stove was not replaced.[11]

The District Court's assertion that Carter-Young had no authority to extinguish the debt misses the point. Roberts never asked Carter-Young to *extinguish* the debt in any legal sense. She requested that Carter-Young cease *reporting* the debt. Whether Ansley (in its own records) maintained the existence of the debt was beside the point. It was the reporting of this fictitious debt that was causing Roberts harm, and Carter-Young was the one doing the reporting. "[E]ven though a furnisher that ends an investigation without verifying a disputed account must cease reporting to CRAs, §1681s-2(b) does not require the furnisher to cease dunning or otherwise attempting to collect the debt. The requirement to delete or modify the offending information is limited to the credit-reporting context." *Hinkle,* 827 F.3d at 1304.

Finally, the FCRA draws no distinction between a furnisher who is the original creditor and one who has a contractual relationship with the creditor such as a debt collector. Section 1681s-2(b)(1) imposes obligations on any "person" who provides information to a CRA, and who receives notice of a dispute. Section 1681a(b) defines a "person" as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or

---

[11] Under the District Court's view, Ansley could have sent Roberts an invoice in the amount of $5,000 or $50,000 for a stove it never purchased and Carter-Young would have had no obligation to question or investigate.

other entity." Carter-Young is clearly a "person" who provides information to CRAs, and it received proper notice of Roberts' dispute. Of course, the reasonableness of a furnisher's investigation may turn to some degree on the furnisher's ability to access relevant information. *See Johnson*, 357 F.3d at 432 (jury should consider "the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information.") Here, however, Ansley was Carter-Young's "client," Roberts provided detailed information in support of her dispute, and Carter-Young had complete access to any evidence in Ansley's possession. Indeed, Carter-Young functioned at all relevant times as Ansley's puppet and made no independent investigation at all. Inasmuch as Carter-Young has yet to answer the Complaint and no discovery has occurred, there is no basis for finding that Carter-Young acted reasonably.

Roberts requests that this Court reverse the District Court and remand for further proceedings.

B. <u>This Court Should Decline To Recognize A "Legal Dispute" Exception To A Furnisher's Obligations Under §1681s-2(b)(1).</u>

The District Court's application of a legal dispute exception to a furnisher's §1681s-2(b) obligations is erroneous for two reasons. One, the exception lacks any legal support and should be explicitly disavowed by this Court. Two, even if adopted, it has no application to Roberts' Complaint.

1. <u>The Statute Does Not Distinguish Between "Legal" And "Factual" Disputes And Includes No Exceptions.</u>

The text of the FCRA does not distinguish between "legal" and "factual" disputes. It merely requires that a consumer "dispute" either "the completeness or accuracy of any item of information in a consumer's file at a consumer reporting agency." Sections 1681i(a)(1)(A), 1681s-2(b)(1). After receiving notice of a dispute from a CRA, the furnisher "shall conduct an investigation with respect to the disputed information," §1681s-2(b)(1)(A), and "if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation," it "shall" modify, delete, or permanently block the reporting of that item of information. §1681s-2(b)(1)(E). Nothing in the statute limits the nature of the dispute that a consumer may raise, provided it relates to specific information in the consumer's file. Further, the statute's use of the word "shall" to describe the furnisher's obligations demonstrates that these obligations are mandatory, not permissive. *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35 (1998) ("instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion.")

The legal/factual dispute dichotomy is best understood as a non-statutory "exception" that some courts have judicially created, primarily in the context of claims brought against CRAs under different statutory provisions than those that apply to furnishers. Whatever the merits of this exception as applied to agencies, the

exception is utterly unfounded in the context of §1681s-2(b)(1) claims against furnishers of information. Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States,* 522 U.S. 23, 29 (1997). "Exceptions to clearly delineated statutes will be implied only where essential to prevent 'absurd results' or consequences obviously at variance with the policy of the enactment as a whole." *United States v. Rutherford,* 442 U.S. 544, 552 (1979).

In this year alone, two circuit courts have reversed decisions by district courts attempting to read non-statutory exceptions into the FCRA. In *Sessa,* the Second Circuit recently rejected the "legal dispute" exception even as applied to claims brought against CRAs under §1681e(b). There, the consumer leased a vehicle with an option to purchase at the end of the lease. The credit union to whom the car dealer assigned the lease furnished information to Trans Union that the consumer owed the residual value at the end of the lease, and Trans Union incorrectly reported the balloon payment as a "debt" on the consumer's credit report. The district court concluded that the consumer's dispute of the debt was a "legal" dispute and granted summary judgment for Trans Union. The Second Circuit reversed, holding that "section 1681e(b) does not incorporate a threshold inquiry as to whether an alleged inaccuracy is 'legal' or 'factual' in nature." 74 F.4th at 43.

In *Ingram,* the Third Circuit recently declined to "imply into the FCRA an exception allowing a furnisher discretion to refuse to investigate an indirect dispute

it deems frivolous or irrelevant." 83 F.4th at 234-235. In that case, the district court granted summary judgment to the furnisher because the consumer failed to submit supporting documentation as requested, the dispute was not "bona fide," and the furnisher's duty to investigate was never triggered. The Third Circuit reversed, finding that the furnisher's investigatory obligation was triggered when it was notified by the CRA of the dispute and that the pertinent statutory language "is mandatory and contains no exceptions." *Id.* at 240. The court concluded that "enforcing the FCRA according to its terms and requiring a furnisher to investigate an indirect dispute forwarded to it by a consumer reporting agency produces no unreasonable results." *Id.* at 241. Further, recognizing such an exception "would undercut a principal goal of the FCRA by shielding furnishers from liability and making it more difficult for consumers to dispute and correct inaccurate information in their credit reports." *Id.* at 243.

2. The "Legal Dispute" Exception, As Applied To Furnishers, Finds Little Support Among The Circuit Courts Of Appeals.

The "legal dispute" exception, as applied to furnishers, finds essentially no support among the circuit court of appeals. As discussed above, the Second Circuit recently rejected the application of a "legal dispute" exception or "threshold inquiry" to CRAs being sued under section 1681e(b). Inasmuch as a furnisher's §1681s-2(b)(1) obligations are greater than a CRA's §1681e(b) obligations, the Second Circuit would almost certainly reject the application of this exception to furnishers.

In *Gross,* the Ninth Circuit explicitly rejected the application of a "legal dispute" exception to furnishers being sued under §1681s-2(b)(1). The consumer disputed a debt on his credit report, contending that under Arizona law, the debt had been eliminated. The district court granted summary judgment to the mortgage holder, but the Ninth Circuit reversed. The court reviewed the pertinent Arizona statute and case law and concluded that the debt had been abolished as a matter of law. Thus, it was inaccurate for the mortgage holder to continue to report the debt as past due and owing. "FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance." *Id.* at 1253. "The distinction between 'legal' and 'factual' issues is ambiguous, potentially unworkable, and could invite furnishers to 'evade their investigation obligation by construing the relevant dispute as a 'legal' one.'" *Id.* at 1253.

Two other circuits have, as justification for applying the "legal dispute" exception to CRAs, held that such disputes are more appropriately investigated by the furnishers who supplied the disputed information. In *Denan,* the consumer sued a CRA under §§1681e(b) and 1681i(a) for continuing to report certain debts as due and owing. The consumer's dispute asserted that the loans were illegally issued under New Jersey law (where the consumer resided) and that there was no legal obligation to repay, even though the loan agreement stated that it was governed by tribal law. The district court granted judgment on the pleadings for the agency, and

the Seventh Circuit affirmed. In doing so, however, the circuit court discussed at length the FCRA's structure and the different roles played by reporting agencies and furnishers. *Id.* at 294. Given the volume of data received by the agencies, "the FCRA does not require unfailing accuracy from consumer reporting agencies," merely that they follow "'reasonable procedures to assure maximum possible accuracy.'" *Id.* (quoting §1681e(b)). "'Accuracy' for furnishers, however, means information that 'correctly [r]eflects . . . liability for the account.'" *Id.* at 295 (quoting 12 C.F.R. §1022.41(a)). This makes sense as furnishers "are in a better position to determine the legal validity of a debt." *Id.* "[A] consumer disputing the legal validity of a debt that appears on her credit report should first attempt to resolve the matter directly with the creditor or furnisher, which stands in a far better position to make a thorough investigation of a disputed debt than the [agency] does on reinvestigation." *Id.* at 297 (quoting *Carvalho v. Equifax Information Services., LLC,* 629 F.3d 876, 892 (9th Cir. 2010)).

Similarly, the Tenth Circuit has held, in the context of a suit brought against a CRA, that agencies are not required "to resolve legal disputes about the validity of the underlying debt they report." *Wright,* 805 F.3d at 1242. Instead, "[t]he FCRA expects consumers to dispute the validity of a debt with the furnisher of the information or append a note to their credit report to show the claim is disputed." *Id.* at 1244.

These holdings by the Seventh and Tenth Circuits were essential to each court's decision and cannot be dismissed as dicta. Only because CRAs rely on furnishers to supply accurate information and the furnishers are in a better position to investigate asserted "legal disputes" did these courts hold that CRAs were not required to investigate such disputes. To turn around and hold that the exception is equally applicable to furnishers would destroy the basis for applying the exception to CRAs.

Although this Court has not yet clearly addressed this exception, its decisions strongly suggest that it would reject the exception, at least as applied to furnishers. In *Saunders,* the violation alleged was not that BB&T reported factually incorrect information, but that it failed to report that Saunders disputed the delinquency (based on BB&T's own errors). The matter proceeded to trial, and the jury returned a verdict finding that BB&T intentionally violated its FCRA duties. On appeal to this Court, BB&T relied upon certain district court decisions suggesting that "reporting a debt without reporting a dispute to the debt is *never* inaccurate as a matter of law." *Id.* at 150 (emphasis included). This Court disagreed:

> To the extent these cases depend upon such reasoning, we find that position plainly inconsistent with the statutory text and longstanding precedent discussed above, including *Dalton. Moreover, all of these cases are distinguishable because they involved claims brought against CRAs under § 1681e(b) or § 1681i, while the case at hand involves a claim against a furnisher under § 1681s–2(b)(1). Claims brought against CRAs based on a legal dispute of an underlying debt raise concerns*

> *about "collateral attacks" because the creditor is not a party
> to the suit, while claims against furnishers such as BB & T do
> not raise this consideration because the furnisher is the creditor
> on the underlying debt.*

*Id.* (Emphasis added). [12]

Although *Saunders* dealt solely with the narrow issue of whether the furnisher should have reported that the debt was disputed, this Court clearly recognized that furnishers are much better equipped to investigate the accuracy, factual or legal, of disputed information. In this regard, this Court clearly placed itself in alignment with the Second, Seventh, Ninth, and Tenth Circuits. Indeed, this Court's very recent decision in *Guthrie* severely undermines the proposition that furnishers need not investigate a consumer's dispute that raises legal questions or defenses. The issue there concerned information on the consumer's credit report reflecting a history of delinquent balances on a homeowner loan. The consumer filed an indirect dispute asserting that the loan had been discharged in bankruptcy. The disputes were sent to the furnisher, PHH, which had obtained an interest in the property through assignment. PHH modified its reporting to reflect that the loan was current and had a zero balance, but it left in place information reflecting a delinquent balance from May 2016 through August 2018, even though Guthrie "had complied with his

---

[12] The court's assertion that the furnisher was the creditor merely reflected the facts in *Saunders.* There is no support for the proposition that a furnisher who is not the creditor has lesser obligations under §1681s-2(b).

obligations under the bankruptcy plan [and] he had no delinquent status at that time." *Id.* at 345. The district court granted summary judgment for PHH, but this Court reversed as "the FCRA requires creditors to also determine whether information they provided in the past is inaccurate." *Id.* Nowhere in its decision did this Court express any concern about the ostensibly "legal" nature of the dispute.

To Roberts' knowledge, the only circuit court decision that has even suggested that the "legal dispute" exception applies to furnishers is the First Circuit's decision in *Chiang v. Verizon New England Inc.,* 595 F.3d 26 (1st Cir. 2010), where the court opined: "Like CRAs, furnishers are 'neither qualified nor obligated to resolve' matters that 'turn[] on questions that can only be resolved by a court of law.'" *Id.* at 38 (quoting *Deandrade v. Trans Union LLC,* 523 F.3d 61, 67 (1st Cir. 2008). The court did not describe why this was true. Moreover, this statement was gratuitous dicta as the court did not identify any disputed questions of law, and it affirmed summary judgment in favor of the furnisher because the consumer engaged in no discovery, "failed to raise a genuine issue of material fact that the investigation was unreasonable," and "failed to show any inaccuracies that [the furnisher] could have found through a reasonable investigation." *Id.*

*Chiang's* dicta is directly contrary to the decisions of the Second, Seventh, Ninth, and Tenth Circuits discussed above. It is at least arguably inconsistent with the Third Circuit's *Ingram* decision. And it is incompatible with this Court's

*Saunders* and *Guthrie* decisions. As one district court has opined, *Chiang* is inconsistent with "the prevailing interpretation of §1681s-2(b)." *Hrebal v. Seterus, Inc.,* 598 B.R. 252, 269-270 (D. MN 2019).

3. The Legal Dispute Exception Is Inconsistent With The Text And Purpose Of §1681s-2(b)(1)(E).

An essential premise underlying the application of the legal dispute exception is that only a court of law can determine the merits of a legal dispute. But this premise, as applied to furnishers, ignores the impact of the 2003 amendments to §1681s-2(b)(1). Prior to these amendments, §1681s-2(b)(1)(D) required furnishers to report the results of its investigation if "the investigation finds that the information is incomplete or inaccurate." The 2003 amendments, however, added subparagraph (E), which did two things. First, it added a third possible ending point to the investigation. Whereas previously the furnisher had two possible choices: (1) accurate/complete or (2) inaccurate/incomplete, there now was a third choice: (3) "cannot be verified." Second, whereas the furnisher's prior obligation was general in nature, i.e., "report the results of the investigation," now its obligation was specific: "if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation, promptly" modify, delete, or permanently block the reporting of that item of information. The furnisher is not required to conclude definitively whether certain information is accurate or inaccurate. It can conclude that it is not in a position to affirmatively "verify" the

disputed information. And if it does so, its obligations are precisely the same as if it had concluded that the information was inaccurate or incomplete. In essence, much like in sports where a replay determination that the video evidence is inconclusive results in the ruling on the field standing as called, Congress decided that in reinvestigating a consumer's indirect dispute, the furnisher must give the consumer the benefit of any reasonable doubt when she disputes information in her credit report. Unless the information can be conclusively verified, i.e. is indisputable, the furnisher must delete, modify, or permanently block the reporting of the disputed information. *See Hinkle,* 827 F.3d at 1303-1304; *Johnson,* 357 F.3d at 432. Thus, any concerns that only a court of law can determine the merits of a legal dispute are misplaced.

Indeed, a consumer's suit under §1681s-2(b) against a furnisher is not, as the District Court here suggested, a collateral attack on, or an attempt to "extinguish," a debt in any legal sense. The FCRA is unconcerned with whether a particular debt can be legally enforced. It is concerned with what information is reported on a consumer's credit record. Even if a furnisher reports a debt as incapable of being verified, "§1681s-2(b) does not require the furnisher to cease dunning or otherwise attempting to collect the debt The requirement to delete or modify the offending information is limited to the credit-reporting context." *Hinkle,* 827 F.3d at 1304.

4. This Court Should Decline To Recognize A Categorical Exception For Legal Disputes.

This Court should reject the application of any categorical legal dispute exception to furnishers being sued under §1681s-2(b). Indeed, it is not apparent from the Complaint that Carter-Young actually relied upon this theory to refuse to investigate. Roberts requests that the District Court be reversed and that the case be remanded for further proceedings.

C. If The Exception Is Applicable To Furnishers, It Must Be Narrowly Cabined And Limited To True Legal "Defenses" To A Debt.

One glaring problem with the "legal dispute" exception, if applied to furnishers, is its amorphous nature and the ease with which a furnisher can (and undoubtedly will) attempt to fit almost any dispute into the exception. Look no further than this case. Roberts disputed the entire factual underpinning of the $791.14 debt and raised no specific legal defense; yet, Carter-Young argued, and the District Court agreed, that her dispute was nevertheless "legal" rather than "factual." The District Court's analysis is highly flawed. If the exception is applicable to furnishers, it must be narrowly defined so that the exception does not become the rule.

Roberts suggests that the exception, if recognized, should be restricted to clear legal "defenses" to an otherwise undisputed debt. In other words, the defense applies where the consumer admits both the existence and amount of the debt, but contends

that the debt cannot be enforced or collected because of specific state or federal law. At a minimum, there must be an actual colorable "dispute" regarding the legal validity of the debt. *See Sessa,* 74 F.4th at n. 7 (observing that even if court were to recognize distinction between legal and factual disputes, creditors had no "colorable legal claim" to recover the amount being reported.). In general, the exception is not triggered simply because the furnisher might need to consult a legal document, be cognizant of well-defined legal principles or statutes, or address amorphous legal questions.

D. Roberts Disputed Both The Factual Existence And Amount Of The Debt. The Complaint Raises No "Legal" Defense To The Debt.

Assuming, *arguendo,* that there is a legal dispute exception to a furnisher's obligations under §1681s-2(b), Roberts' Complaint, fairly construed, does not even remotely assert a "legal" defense or challenge to the debt. To the contrary, it repeatedly and plausibly challenged the factual existence and amount of the debt. The District Court's contrary conclusion is based on both an incorrect view of what constitutes a legal dispute and an improper recharacterization of the Complaint.

1. Roberts' Dispute Did Not Raise Any Underlying Legal Questions That Only A Court Could Resolve. A Legal Dispute Does Not Exist Merely Because A Furnisher May Need To Consult A Legal Document Or Be Cognizant Of Undisputed Legal Principles.

Throughout its decision, the District Court viewed the FCRA as relieving a furnisher from any obligation to investigate a consumer's dispute if in doing so the

furnisher would need to consult a legal document such as a lease agreement or refer to any legal statute or precedent no matter how well established or undisputed. In the District Court's view, Carter-Young had no obligation to investigate because Roberts alleged (alternatively and in two isolated paragraphs) that certain damages claimed were ordinary "wear and tear," which could not be charged to her under the terms of the lease or state law. (¶¶ 16 and 18). The District Court also identified two questions that it characterized as "legal," which it believed Carter-Young was not required to investigate or take action on: (1) "whether Ansley could retain Plaintiff's security deposit for ordinary wear and tear" and (2) "whether Ansley could charge Plaintiff the full replacement value of a stove when the alleged damage consisted of a broken door handle." (JA 80). The District Court's analysis is without any legal support.

If, as the District Court held, a dispute becomes "legal" if the furnisher may need to consult a legal document or be cognizant of basic legal principles, most disputes could be reclassified as "legal." It is difficult to conceive of any debt that does not have at its foundation some legal document that might require consultation if a consumer disputes the debt. In *Sessa,* the Third Circuit declined to recognize the legal dispute exception as applied to CRAs, but observed that even if the exception had merit, there was no "legitimate" legal dispute because the lease agreement clearly contained no "balloon payment." Thus, the information furnished was

factually inaccurate and the creditor would not "have had a colorable legal claim against Sessa for recovery of the amount reported as a balloon payment." 74 F.4th at n. 7. That the furnisher needed to consult an underlying legal document such as a "lease" did not create a "legal dispute." *See Johnson,* 357 F.3d at 431 (furnisher unreasonably failed to "consult underlying documents such as account applications"); *Hinkle,* 827 F.3d at 1305 (same).

The same can be said for statutes or court decisions that may have applicability to a particular dispute. In *Guthrie,* the furnisher was required to be cognizant of a bankruptcy court decision and the legal impact of such a decision. 79 F.4th at 345. In *Gross,* the furnisher was obligated to consult the Arizona Anti-Deficiency Statute, as well as applicable Arizona court decisions. 33 F.4th at 1252-1253.

Thus, Roberts' alternative "wear and tear" contention did not create a legal dispute. This is not a disputed principle of law, and Carter-Young easily could have verified it either by looking at the cited statute or the lease agreement. No legal judgment was required. Nor was it necessary to apply North Carolina law, which does not purport to define "wear and tear." [13]

---

[13] Even If Carter-Young had no obligation to investigate Roberts' second alternative contention that certain damages constituted ordinary "wear and tear," that would not justify its refusal to investigate her primary contention that the claimed damages were nonexistent and her first alternative contention that if they existed, they were grossly overstated.

Regarding the two questions of law identified by the District Court, one is not placed in issue by the Complaint, and the other is not a "legal" question. The Complaint does not challenge Ansley's retention of her $500 security deposit and Roberts never asked Carter-Young to investigate the damages covered by the security deposit. The reason is apparent. Because Ansley retained the security deposit, nothing was reported by Carter-Young to the CRAs and there was nothing to dispute. The $791.14 debt related to charges not covered by the security deposit. The security deposit is wholly irrelevant to the Complaint.

As for the $500 charge for a new stove, there is no universe in which a landlord can charge a tenant the full cost of a new appliance when the appliance itself is not damaged and is not even replaced. [14] This is not a "colorable" question of law and certainly not the type of difficult legal question that a furnisher is free to categorically ignore. As the Third Circuit recognized in *Sessa,* a debt that lacks a bona fide factual basis also lacks a "colorable" legal basis. But such a dispute is without question a factual dispute. There is no need for the furnisher to make a legal judgment and indeed no law to consider or apply. 74 F.4th at n. 7. Carter-Young's obligation was to determine whether it could affirmatively "verify" this substantial charge. And if,

_____

[14] Under the District Court's approach, the consumer's dispute in *Johnson* could have been recharacterized as whether a credit card company can hold a spouse legally responsible for her husband's $17,000 account.

as alleged, Ansley did not replace the stove and did not purchase a new stove, it follows that Ansley could not produce any documentation that would verify, i.e., prove this charge. It further follows that when Carter-Young verified the debt yet again on September 30, it did so without any documentation to support the debt, and its "verification" was a violation of §1681s-2(b)(1)(E) as a matter of law.

2. Roberts' State Court Lawsuit Against Ansley Did Not Create a Legal Issue.

The District Court's conclusion that Roberts' dispute was "legal" in nature because Roberts filed a small claims lawsuit against Ansley "hoping" to invalidate the debt is without merit. (JA 76-77, JA 83). Initially, the lawsuit was premised entirely on the NCDCPA, which regulates the conduct of those persons who attempt to collect their own debts. N.C.G.S. §75-50(3). The Act does not provide any "legal defense" to a debt. Rather, it regulates the *conduct* of debt collectors (as defined) in attempting to collect debts, whether valid or invalid, and creates certain unfair and deceptive trade practices for which any aggrieved person is entitled to recover actual damages, civil penalties, and punitive damages. *See Guthrie,* 79 F.4th at 342-343. The state court lawsuit challenged Ansley's "conduct" in attempting to collect the alleged debt. Ansley is not a party to this federal lawsuit and its conduct in attempting to *collect* the debt is wholly irrelevant. Roberts never asked Carter-Young to determine whether Ansley violated the NCDCPA. In *Guthrie,* the consumer sued the creditor under both the NCDCPA and FCRA §1681s-2(b)(1). This Court concluded

that Guthrie was entitled to proceed to trial on both claims. The two statutes addressed different issues and conduct, and each claim was entirely independent of the other. 79 F.4th at 342-345.

As for Roberts' "hope" that the lawsuit might "invalidate" the debt and cause Carter-Young to delete its reporting of the debt, that "hope" does not alter the nature of the lawsuit or expand the remedies available in a small claims lawsuit. Such lawsuits only permit recovery of monetary damages. They do not authorize declaratory relief. *See* N.C.G.S. §7A-210. Further, a debt may be "factually" invalid, which is precisely what Roberts has consistently alleged. Drawing all reasonable inferences in her favor, Roberts' Complaint alleges that she filed the Ansley lawsuit as a last resort. Her house had been sold effective October 12, and the reporting of the $791.14 debt was precluding her from renting an apartment. It was already mid-September, and Carter-Young was continuing to reverify the debt without undertaking any investigation of her dispute. Roberts recognized that an FCRA lawsuit against Carter-Young would never yield any timely relief. [15] Roberts further recognized that Carter-Young was being controlled by Ansley and the only legal action that would even conceivably force Ansley to compel Carter-Young to delete its reporting of the $791.14 debt before October 12 was a small-claims lawsuit

---

[15] We are now eleven months since the filing of this lawsuit, and no Answer has been filed.

against Ansley. Roberts' "hope" was that the quick hearing date (October 7) might cause Ansley to instruct Carter-Young to delete its reporting of the debt. And, as alleged, that is precisely what occurred, albeit at the very last minute.

3. Roberts' Allegations That the Debt Was Fraudulent and Retaliatory Were Factual Assertions and Did Not Create a Legal Dispute.

The District Court's conclusion that Roberts's allegations that the debt was fraudulent and retaliatory "would require Defendant's interpretation and application of a legal instrument (Plaintiff's lease) or state law," thereby creating a legal dispute (JA 81) is without merit. Roberts was not asserting legal claims under state law. She was contending that the debt was purely fictitious and motivated by a desire to penalize her. Nothing in these allegations required Carter-Young to exercise any legal judgment. Ansley's retaliatory motive is not a *legal defense* to the debt. It is an *explanation* for why Ansley would falsify a debt. It makes it more plausible that Ansley would fabricate nonexistent "damages" than if there were no such motive. And it explains why Ansley would charge Roberts the cost of a new stove when the door handle could be (and was) reattached in minutes. *See Pinner, supra,* 805 F.2d at 1260, 1262 (retaliatory motive of manager relevant and required additional investigation in verifying alleged fictitious charges on credit account).

Similarly, Roberts' assertion that the debt was "fraudulent" did not raise a fraud claim under state law or assert a "legal" defense to an otherwise valid debt. She used the terms "fraud" and "fraudulent" as those terms are defined in common

usage; i.e, fictitious and intended to deceive or mislead. Fraud allegations are properly raised and investigated in FCRA disputes. In *Ingram,* the Third Circuit concluded that a consumer's indirect dispute asserting that his credit report included an "account that was falsely created in his name" was proper and required that the furnisher conduct a reasonable investigation. 83 F.4th at 234. The consumer was not required to file a fraud affidavit or police report. *Id.* at 241.

4. Roberts Repeatedly Disputed the Factual Existence And Amount Of The $791.14 Debt. The District Court Improperly Recharacterized Plaintiff's Factual Allegations And Drew Inferences Adverse to Plaintiff.

Measured against the foregoing legal background, Roberts' Complaint sufficiently pleads viable causes of action against Carter-Young. Throughout the Complaint Roberts primarily asserted that the $791.14 debt lacked any factual basis; i.e., the asserted damages never "occurred." Alternatively, Roberts alleged that any damages that did occur were grossly overstated. Both allegations raise challenges to the factual accuracy of the debt. Yet, the District Court chose to recharacterize and disregard these allegations.

The District Court asserted that "the Complaint fails to cite any specific damage that 'never occurred' for which Ansley charged her" and therefore "the Court should read that phrase . . . as synonymous with the phrase 'grossly overstated.'" (JA 74, n. 1). This is an improper recharacterization of a valid Complaint allegation. As noted, there are two components of the $791.14 debt, the

$500+ charge for a new stove and unspecified miscellaneous damages making up the remainder of the $791.14. Regarding the stove charge, Roberts alleged there was no damage at all to the stove itself, Ansley never claimed any such damage, and Ansley never replaced the stove. Because Ansley did not claim any damage, it is impossible for Roberts to be any more specific. This particular charge was purely fictitious. Roberts' allegations are not labels; rather they are very specific "facts" that Carter-Young was fully capable of investigating.

Further, even if Roberts' allegation that the damages claimed were nonexistent could properly be conflated with its alternative allegation that the damages were grossly overstated, a challenge to the "amount" of a debt is as much a challenge to its factual accuracy as is a challenge to the "existence" of the debt. Neither contention presents a "legal defense" or any question of law that only a court could answer. The District Court, however, discounted Roberts' allegation that any damages that did occur were grossly overstated because the allegation lacked sufficient specificity and was "too conclusory to support a claim" and a reasonable investigation "should not require hiring contractors to visit apartments across the country in order to render second opinions as to repairs that have already taken place." (JA 80, n. 2). This was improper.

There was nothing remotely nonspecific or conclusory about Roberts' dispute of the charge for a new stove. If a detached oven door handle that is rectified by

reattaching the handle constitutes "damage," which Roberts disputes, a $500+ charge for a new stove clearly constitutes a gross overstatement of damages. This is an issue of fact, not law. As for the unspecified miscellaneous damages that make up the rest of the $791.14 debt, Roberts clearly alleged these damages were either nonexistent, grossly overstated, or ordinary wear and tear. Even if the "wear-and-tear" allegation can be characterized as "legal," the first two contentions are clearly factual. No greater specificity was required at the pleading stage.

Finally, Roberts never suggested that Carter-Young should seek second opinions from other contractors. This is pure hyperbole by the District Court. Carter-Young was obligated to conduct a "reasonable investigation." It had direct access to its "client" Ansley and could have, at a minimum, investigated whatever evidence Ansley had to prove the factual accuracy of the debt. And if as alleged, there was no evidence to prove the debt other than Ansley's self-serving representation, Carter-Young was legally obligated to delete or block the reporting of the debt. Its complete refusal to investigate Roberts' dispute and its unsubstantiated verification of the debt violated §1681s-2(b) as a matter of law.

## CONCLUSION

Roberts respectfully requests that this Court reverse the District Court and remand for further proceedings.

## ORAL ARGUMENT STATEMENT

Oral argument is requested as this appeal presents issues of importance regarding the full scope of a furnisher's legal obligations under FCRA §1681s-2(b), including a question of first impression. In granting Carter-Young's Rule 12(b)(6) motion to dismiss, the District Court interpreted §1681s-2(b) in an exceedingly narrow manner that is inconsistent with this Court's current FCRA jurisprudence, and it applied a non-statutory exception that this Court has never adopted and that at least four other circuit courts of appeal have rejected. Oral argument will assist this Court in addressing and resolving these significant issues.

Respectfully submitted December 1st, 2023,

*/s Charles P. Roberts, III*
Charles P. Roberts, III
ATTORNEY AT LAW
7001 Mustang Court
Summerfield, NC 27358
336-392-3155
cprobertsiii@protonmail.com

# CERTIFICATE OF COMPLIANCE

1.    The foregoing brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2.    Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, the foregoing brief contains <u>12,956</u> words.

3.    I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief with the word or line printout.


*/s Charles P. Roberts, III*
Charles P. Roberts, III